CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED

1/12/2026

LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| JEFFREY EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-00020 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| LAURENCE WANG, *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Plaintiff Jeffrey Edwards, a prisoner housed at the Virginia Department of Corrections' ("VDOC") Green Rock Correctional Facility ("Green Rock"), filed this action against 14 members of Green Rock's medical staff (collectively "Defendants").[1] Edwards, a diabetic, alleges that he received inadequate medical treatment from Defendants, which culminated in an intractable foot infection and the amputation of his right leg. He asserts claims of deliberate indifference to his serious medical needs under 42 U.S.C. § 1983, as well as state-law claims of medical malpractice and gross negligence, against all Defendants.

The matter is before the court on Defendants' various motions to dismiss. The parties have fully briefed the motions, and they are ripe for disposition. For the reasons discussed below, the court will grant in part the motion to dismiss filed by Defendants Wang, Autry, Crockett, Haymore, Hodnett, Keene, Miraglia, Toler, Tuck, Weaver, and Williams; will grant

---

[1] The Complaint names 14 defendants: Dr. Laurence S. Wang ("Dr. Wang"); Director of Nursing Carrie Mayes ("Director Mayes"); and Nurses Teresa Autry, Sheila Crockett, Kiera French-Torres, Ronnie Haymore, Shaliyah Hodnett, Latoya Keene, Maria Miraglia, Deloris Suitt, Terry Toler, Sandra Tuck, Sara Weaver (a nurse practitioner), and Mary Williams ("the Nurse Defendants").

Defendant Mayes's motion to dismiss in part; and will grant Defendant French-Torres's motion to dismiss.

## I.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

The following facts are taken from Edwards's Amended Complaint and, at this stage, the court accepts these facts as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Prior to February 15, 2023, Edwards, a diabetic, was housed at the VDOC Nottoway Correctional Center, where he initially developed a diabetic foot ulcer on his left foot. (Am. Compl. ¶ 9 [ECF No. 31].) A physician at Nottoway started Edwards on a course of antibiotics and ordered a wound-care consultation and "consultation by an in-house doctor 'ASAP on Monday.'" (*Id.*) But on February 15, before that treatment could begin, Edwards was transferred—along with his Nottoway medical records—from Nottoway to Green Rock. (*Id.* ¶¶ 9, 10.) At intake, Dr. Wang and Nurse Miraglia conducted a medical review with Edwards, including "document[ing] his current medical conditions and medications as obtained from Nottoway." (*Id.* ¶ 13.) Dr. Wang prescribed treatment for his left foot ulcer but did not address his right foot, which presented with dry, flaky patches. (*Id.* ¶ 10.) At that time, Dr. Wang, Director Mayes, and Nurse Miraglia did not "conduct[] or order[] any testing or assessment to inform an appropriate treatment plan for his diabetes" or direct other medical staff to do so.[2] (*Id.* ¶¶ 10, 13.) Further, Dr. Wang either "failed to prescribe an appropriate diabetic diet for Mr. Edwards, or . . . failed to see [to] its implementation," leading to Edwards having "no

---

[2] The Amended Complaint identifies vascular testing as an important assessment to detect venous reflux, a condition that can slow blood flow and healing to the feet and stymy the efficacy of antibiotics. (*See* Am. Compl. ¶ 7.) Diabetes patients with venous reflux are often afflicted with foot ulcers which, combined with high blood sugar, can become infected and lead to amputation. (*Id.* ¶ 8, 9.)

choice" but to eat the same starch-heavy food as the regular food tray, with the exception of fruit for dessert. (*Id.* ¶¶ 14–17.) Dr. Wang also did not adjust Edwards's medication to lower his consistently high blood sugar. (*Id.* ¶ 17.) Edwards contends that a proper diabetes treatment plan "necessarily incorporates assessment and testing results[] and controls blood sugar through medication management and diet[, which] . . . must align with dietary conditions in the facility." (*Id.* ¶ 7.)

Over the next week, Edwards was treated by Nurses Autry, Haymore, and Hodnett. (*Id.* ¶ 18.) By February 21, Edwards presented with a right-foot wound. (*Id.*) Dr. Wang prescribed daily foot dressings over the next two weeks, a topical antibiotic, and one gel insole, although it was never issued. (*Id.*) On February 22, Dr. Wang ordered an outside wound-care appointment, as recommended on Edwards's Nottoway medical chart, and substituted Bactrim antibiotic for the antibiotic Edwards was prescribed at Nottoway. (*Id.* ¶¶ 9, 18, 19.) Dr. Wang did not order a wound culture or sensitivity test, which Edwards contends are necessary to identify the strain of bacteria in a patient's unhealing diabetic wound. (*Id.* ¶ 9.)

On February 27, just before Edwards was released from medical observation to general inmate housing, Nurse Miraglia noticed that Edwards's right foot had begun oozing yellow exudate,[3] and his heel was draining fluid. (*Id.* ¶ 20.) Dr. Wang ordered daily dressing of this wound but did not obtain a wound culture or confirm that the outside wound-care appointment was scheduled. (*Id.*) Over the next two weeks, Nurses Crockett, French-Torres,

---

[3] Exudate is a medical term that refers to "fluid that leaks out of blood vessels into nearby tissues. The fluid is made of cells, proteins, and solid materials. Exudate may ooze from cuts or from areas of infection or inflammation. It is also called pus." MedlinePlus.com, *Exudate*, available at https://medlineplus.gov/ency/article/002357.htm.

Keene, Miraglia, Toler, Williams, "and other nurses" treated Edwards, but "[n]o outside wound[-]care appointment was scheduled or alternative course of treatment implemented." (*Id.* ¶¶ 20–22.) By March 11, Edwards's feet were oozing and bleeding, and his toes were swollen. (*Id.* ¶ 22.) Nurse Miraglia treated Edwards that day, and in response to Edwards's inquiries, she stated that she would verify if the outside wound-care appointment had been scheduled. (*Id.*) Two days later, she treated Edwards again but did not provide an update on the status of his appointment. (*Id.*) She also noted that, even though he was taking his Bactrim antibiotic, "[i]t was simply not working." (*Id.*)

On March 29, Edwards presented to an outside physician, Dr. William McConahey, for his wound-care appointment. (*Id.* ¶ 23.) Dr. McConahey debrided Edwards's wounds, assessed a "medium" necrotic amount in the fat layer of his feet, ordered vascular testing, identified him "as a high risk for poor nutrition due to his lack of dietary choices," and diagnosed Edwards with diabetic neuropathy. (*Id.* ¶¶ 24–25.) He also prescribed new wound-care instructions, including a saline wash for each wound, offloading shoes, and thrice-weekly foot dressings with Hydrofera Blue Classic Foam, ABD Pads, and Optifoam non-adhesive dressing. (*Id.* ¶ 24.) These wound-dressing orders were handwritten in Edwards's Health Services Complaint Form, a chronological log of treatment notes, but were not placed in Edward's electronic medical chart. (*Id.* ¶ 29.) On later treatment dates, Nurse Suitt did not use saline to clean Edwards's wounds, and although Nurses Autry, Miraglia, Suitt, Toler, and Weaver used the Hydrofera Blue Classic Foam to dress Edwards's feet, they did not use the other prescribed dressings, apparently because they were "out of stock." (*Id.* ¶ 30.) Three weeks later, on April 20, these dressings "were still 'out of stock'" and "had not been ordered

by Dr. Wang, Director Mayes, or Defendant Nurses treating Mr. Edwards in April, and appear to have never been obtained for Mr. Edwards's care during relevant times." (*Id.*) The treating Nurses also failed to "consistently document their treatment steps and/or failed to change Mr. Edwards's dressing as least three times each week as ordered." (*Id.*) While Director Mayes had access to Edward's treatment log and reviewed his log "during the relevant period," she did not order the nursing staff to comply with the orders or document their treatments. (*Id.* ¶¶ 12, 30.)

By April, Edwards began experiencing worsening foot wounds and edema (swelling) in his lower legs and feet. (*Id.* ¶¶ 28, 30.) On April 8, Nurse Weaver observed the edema in his feet and prescribed Lasix in response. (*Id.* ¶ 31.) On April 13, Nurse Toler observed the edema again and instructed the Lasix to begin "soon," but "[t]he medical unit [did] not issue Lasix to Mr. Edwards until nearly a month later, just before his amputation." (*Id.*) During later treatments, Nurses Suitt, Toler, and Weaver observed that Edwards's foot wounds "began to smell foul," but they did not make any changes to his treatment, nor did anyone address "staff noncompliance with the wound cleaning regimen." (*Id.* ¶ 32.)

On April 10, Edwards's lab tests showed high levels of Vitamin D and low levels of Vitamin C, which indicate physiological complications in diabetic patients. (*Id.* ¶ 33.) Dr. Wang did not implement changes to Edwards's treatment, including nutritional changes or supplements. (*Id.*) On April 12, pursuant to Dr. McConahey's March 29 orders, Edwards had an ultrasound of his legs. (*Id.* ¶ 34.) The ultrasound revealed that Edwards suffered from venous reflux. (*Id.*) The results were placed in Edwards's chart on April 24 after he reported to Nurse Weaver that the ultrasound had been completed. (*Id.*) "This additional diagnosis

prompted no change in care or treatment plan to prevent infection or help heal Mr. Edward's worsening wounds." (*Id.*)

On April 18, Dr. McConahey again treated Edwards during a follow-up wound-care appointment, which Edwards contends "should have been scheduled for April 12." (*Id.* ¶ 35.) Dr. McConahey prescribed the same dressing and offloading measures as his March 29 orders, but "[a]ll Defendants failed to use available means to enforce offloading." (*Id.*) By April 22, unidentified nursing staff noted new injuries to Edwards's right foot and, a day later, Edwards reported flaky skin on his buttocks and upper thigh. (*Id.* ¶¶ 36, 37.) In response, Nurse Practitioner Weaver prescribed Lubriderm skin lotion. (*Id.* ¶ 37.) Edwards also reported that his right leg ached; Nurse Autry and Dr. Wang prescribed him Bengay topical rub, but neither Dr. Wang, Director Mayes, Nurse Aury, nor Nurse Weaver made additional changes to his treatment or ordered testing "in response to these apparent new developments in his diabetes complications." (*Id.*)

When Edwards saw an unidentified nurse on May 1, his right sock was saturated with blood and his fourth toe was swollen and bleeding. (*Id.* ¶ 40.) The nurse diagnosed the bleeding and discoloration as a contusion and avulsion and referred Edwards to Dr. Wang. (*Id.*). The next day, Edwards presented to Nurse Toler, who observed bleeding and odor from the wounds on his right foot and "remarked that he would probably lose his toe." (*Id.* ¶ 41.) Nurse Toler also referred Edwards to Dr. Wang, who saw him later that day. (*Id.*) Dr. Wang again ordered Bactrim and prescribed two topical antifungals, though Edwards did not receive the Bactrim or one of the prescribed antifungals until May 5; he never received the other antifungal. (*Id.* ¶¶ 42–44, 48.)

On May 3, Dr. Wang ordered a wound culture of Edwards's right foot. (*Id.* ¶ 45.) The results of the wound culture, received on May 11 (two days after Edwards's eventual amputation), revealed that penicillin and ampicillin, not Bactrim alone, were needed to treat the specific bacteria, beta hemolytic streptococcus, that infected Edwards's wounds. (*Id.* ¶ 54.)

On May 4, Edwards saw Dr. McConahey for an additional follow up. (*Id.* ¶ 46.) Dr. McConahey again debrided his wounds and confirmed that Edwards would likely lose his toe. (*Id.* ¶¶ 46, 47.) Dr. McConahey prescribed a new wound dressing regimen, including antimicrobial AquacelAg Advantage and Curad Xeroform Sterile dressings. (*Id.* ¶ 47.) On May 5 and 6, Nurses Autry, Crockett, Miraglia, and Tuck treated Edwards, but did not follow Dr. McConahey's ordered dressing regimen. (*Id.* ¶ 49.) On May 7, when Edwards presented to Nurse Miraglia with a fourth toe that was "completely black on the bottom, and red and swollen on top" and which caused "odor [to] permeate[] the room," Nurse Miraglia cleaned his foot with the AquacelAg dressing, as Dr. McConahey had directed. (*Id.* ¶ 50.)

On May 7, Nurses Miraglia and Weaver sent Edwards to the emergency room, and soon after, he was admitted to Lynchburg General Hospital. (*Id.* ¶ 51.) Medical staff performed imaging and determined that the infection of Edwards's right foot was so severe that a below-the-knee amputation was necessary. (*Id.* ¶¶ 52, 53.) The amputation was performed on May 9. (*Id.* ¶ 53.) After discharge from Lynchburg, Edwards was sent to a rehabilitation facility where he received "intensive therapy, pharmacy medication review, education, monitoring, and nursing." (*Id.* ¶ 55.) Additionally, Edwards was provided double-protein meals and a protein drink. (*Id.*)

Edwards filed suit on April 17, 2025, for his injuries, including the loss of his right foot and attendant "phantom pain," additional pain and suffering, emotional distress, "humiliation and embarrassment," expenses associated with future medical care, loss of income, and other losses. (*Id.* ¶ 57.) Count I of the Amended Complaint alleges deliberate indifference to a serious medical need under 42 U.S.C. § 1983 against all Defendants. (*Id.* ¶ 58.) Count II alleges medical malpractice and gross negligence against all Defendants. (*Id.* ¶ 59.) Defendants Wang, Autry, Crockett, Haymore, Hodnett, Keene, Miraglia, Toler, Tuck, Weaver, and Williams timely filed a joint motion to dismiss (ECF No. 51), and Defendants Mayes and French-Torres filed separate motions to dismiss (ECF Nos. 55, 61). Because the motions put forth similar arguments in response to the same underlying Complaint, the court will address all motions jointly.

## II.    S̲T̲A̲N̲D̲A̲R̲D̲ O̲F̲ R̲E̲V̲I̲E̲W̲

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S.

at 555, 557). When evaluating the sufficiency of a complaint, the court is obligated to consider the factual allegations asserted in the complaint as well as any exhibits attached thereto. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing Fed. R. Civ. P. 10(c)).

## III.    DISCUSSION

Edwards alleges that, "[o]ver a period of months," he "was denied medical and dietary care that responded to his serious medical needs, including woefully deficient assessment, management and treatment of his diabetes and diabetic foot wounds." (Am. Compl. ¶ 1.) He asserts deliberate indifference, gross negligence, and medical malpractice claims against each Defendant. (*Id.* ¶¶ 58, 59.) For the reasons discussed below, the court concludes that Edwards has adequately stated a claim of deliberate indifference against Defendants Autry, Miraglia, Suitt, Toler, Wang, and Weaver. And although Edwards has not stated a claim for gross negligence against any Defendant, he has adequately pleaded medical malpractice under a theory of ordinary negligence against Defendants Autry, Crockett, Mayes, Miraglia, Suitt, Toler, Tuck, Wang, and Weaver.

### A.  Deliberate Indifference

The Eighth Amendment guarantees prisoners "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Thus, "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment."[4] *Jackson v. Lightsey*, 775 F.3d

---

[4] In *Short v. Hartman*, the Fourth Circuit distinguished the test for deliberate indifference claims under the Fourth Amendment (as applied to pre-trial detainees) from the test for claims under the Eighth Amendment (as applied to post-conviction inmates). 87 F.4th 593 (4th Cir. 2023). Until *Short*, the standards were the same, *regardless of the plaintiff's incarcerated status. See, e.g., Stevens v. Holler*, 68 F.4th 921 (4th Cir. 2023). Occasionally, the court cites cases it finds instructive but involve the rights of pre-trial detainees, but those cases pre-date *Short* and, hence, apply the same analysis as used in Eighth Amendment claims.

170, 178 (4th Cir. 2014); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the type of unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.") To survive a motion to dismiss, a prisoner's allegations must show that (1) objectively, the alleged deprivation was "sufficiently serious," and (2) subjectively, the defendants acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

In medical-needs cases, a prisoner satisfies the first prong by alleging that he had a "serious" medical need that has "'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). Diabetes and diabetic neuropathy, especially diagnoses requiring a host of medications and nutritional accommodations, are typically considered sufficiently serious medical conditions under this prong. *See Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (alterations in original) (recognizing plaintiff's diabetes as a serious medical condition and listing other circuits that have held that "it is a '[w]ell-known' fact that diabetes is a 'common yet serious illness that can produce harmful consequences if left untreated for even a short period of time'" (quoting *Lolli v. City of Orange*, 351 F.3d 410, 419–20 (9th Cir. 2003))); *Hixson v. Hutcheson*, No. 5:17-CV-032, 2019 WL 302516, at *4 (W.D. Va. Jan. 23, 2019), *aff'd*, *Hixson v. Moran*, 1 F.4th 297 (4th Cir. 2019); *Napier v. Ohai*, No. 7:23-cv-00098, 2025 WL 2779900, at *5, 13 (W.D. Va. Sep. 26, 2025).

Here, Edwards alleges that he entered Green Rock with "uncontrolled diabetes and increasingly severe diabetic ulcers on his feet," and that Dr. McConahey later diagnosed him

- 10 -

with diabetic neuropathy. (*See* Am. Compl. ¶¶ 1, 25.) The Amended Complaint also details the physiological complications of diabetes, including the development of ulcers and infections, the possibility of amputation if the symptoms are left untreated or become too severe, and the requirements for adequate diabetes treatment to avoid these outcomes. (*Id.* ¶¶ 8–9.) Defendants, to their credit, do not dispute that diabetes is a serious medical condition that requires medical treatment. Accordingly, Edwards has sufficiently alleged that he was inflicted with a serious medical need and thus satisfies the first prong of the *Farmer* test.

The lion's share of the Defendants' arguments concerns the second *Farmer* prong, which requires a showing that the defendant acted with a "sufficiently culpable state of mind." 511 U.S. at 834. In medical-needs cases, a prisoner must allege that "[(a)] the official kn[ew] of and [(b)] disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. While a plaintiff can satisfy both subparts of this prong with either direct or circumstantial evidence, pleading the subjective element is a high bar to clear, requiring allegations of a mental state on par with "recklessness of the subjective type used in criminal law." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). Allegations of "mere negligence" alone do not meet the high bar of a deliberate-indifference claim, though plaintiffs do not need to allege "actual purposive intent." *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013); *see also Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018).

To establish that the defendant knew of the risk of harm, a prisoner may allege that a prison official was familiar with the medical condition by formerly treating the patient or

reviewing medical charts. *See Scinto*, 841 F.3d at 229 ("As Plaintiff's prison doctor, [the defendant] knew of Plaintiff's serious medical condition. . . . Plaintiff's lengthy prison medical records show that his diabetes diagnosis was 'longstanding, pervasive, well-documented, [and] expressly noted by prison officials[.]'" (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 308 (4th Cir. 2004))). Additionally, a prisoner can demonstrate "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2005) (quoting *Farmer*, 511 U.S. at 842.) In many cases, a defendant's status as the prisoner's attending physician or nurse, particularly one who "personally witnesse[s] the degeneration" of a prisoner's condition, is sufficient to establish actual knowledge. *Formica*, 739 F. App'x at 758; *see also Hutcheson*, 2019 WL 302516, at *4; *Borrero v. Williams*, No. 5:23-1065-TMC-KDW, 2023 WL 9523565, at *4 (D.S.C. Dec. 19, 2023).

To determine whether a defendant recognized that their actions were "[in]sufficient to mitigate" the risk of harm to the inmate, *Parrish*, 372 F.3d at 303, courts consider whether the prison official "responded [un]reasonably to the risk." *Farmer*, 511 U.S. at 837; *see also Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer,* 511 U.S. at 837; *Cooper v. Dyke*, 814 F.2d 941, 945 (4th Cir. 1987) ("[G]overnment officials who ignore indications that a prisoner's . . . initial medical treatment was inadequate can be liable for deliberate indifference to medical needs."). While prisoners cannot merely allege that they disagreed with the physician over the course of medical treatment, allegations that the given treatment was inadequate because it fell "so far afield of [the] accepted professional standard . . . raise an inference of deliberate indifference." *Dallas v. Craft*, No. 3:21cv349, 2022 WL 4370440, at *8 (E.D. Va. Sep. 21, 2022) (citing *Zackery v. Mesrobian*, 299 F. App'x 598, 601 (7th

Cir. 2008)); *see also Jackson v. Sampson*, 536 F, App'x 356, 357 (4th Cir. 2013) ("An inmate's mere disagreement with the course of treatment provided by medical officers will not support a valid Eighth Amendment claim."); *Parrish*, 372 F.3d at 303 (describing that deliberate indifference claims require "conscience-shocking" conduct). But merely providing "some treatment" does not absolve a defendant of liability:

> [I]magine that prison officials prescribe a painkiller to an inmate who has suffered a serious injury from a fall, but that the inmate's symptoms, despite the medication, persist to the point that he now, by all objective measure, requires evaluation for surgery. Would prison officials then be free to deny him consideration for surgery, immunized from constitutional suit by the fact they were giving him a painkiller? We think not.
>
> . . .
>
> The mere fact that [a prison] has previously acknowledged [a prisoner's] condition and agreed to provide treatment in no way forecloses the possibility that its performance under that agreement later became constitutionally deficient.

*De'lonta*, 708 F.3d at 526 (emphasis removed).

In some cases, inadequate care may arise from "a doctor's failure to provide care that he himself deems necessary to treat an inmate's serious medical condition." *Lightsey*, 775 F.3d at 179 (citing *Miltier*, 896 F.2d at 853) (finding that prisoner adequately alleged deliberate indifference because he pleaded that physician failed to follow up on ensuring that the tests and treatments he ordered were done, and inferring that "when [the doctor] prescribed a set of tests and treatments . . . . he did so because he subjectively believed they were necessary, and therefore must have known that failing to provide them would pose an excessive risk to [the prisoner's] health"). Further, in cases involving diabetic patients, failure-to-treat claims can be premised on a failure to provide the prisoner with adequate nutrition. *See Scinto*, 841

F.3d at 233 (listing cases that establish a prison official's duty under the Eighth Amendment to provide a diabetic prisoner with a "medically appropriate diet," though that can be accomplished by providing nutritional education or giving the prisoner the option to choose suitable foods from those provided).

The intentional delay of medical care may amount to a constitutional violation if it "'results in some substantial harm to the patient,' such as 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Formica*, 739 F. App'x at 755 (quoting *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 (4th Cir. 2008)); *see also Estelle*, 429 U.S. at 104–05 (observing that deliberate indifference can manifest as "intentionally denying or delaying access to medical care"). As the "gatekeeper[s] for other medical personnel capable of treating the condition," prison medical providers may not excessively delay or refuse to provide the prisoner access to outside medical care. *Dallas*, 2022 WL 4370440, at *8 (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)).

The Fourth Circuit considered this gatekeeping function in *Pfaller v. Amonette*, where the estate of a prisoner brought deliberate-indifference claims against prison medical staff—including Dr. Wang—premised on their failure to treat the prisoner's undiagnosed liver cancer *and* their delay in referring the prisoner to an outside doctor for diagnosis. 55 F.4th 436, 442 (4th Cir. 2022). In that case, Dr. Wang argued that the prisoner's evidence was, at best, evidence of medical negligence. *Id.* at 449. But hearing the case on summary judgment, the court disagreed. *Id.* at 452. When the prisoner's bloodwork showed alarming scores indicative of liver cancer, Dr. Wang's "fail[ure] to refer [plaintiff] for further testing when he demonstrated signs of an increasingly serious medical condition 'raised an inference [of]

- 14 -

deliberate indifference.'" *Id.* at 450 (quoting *Scinto*, 841 F.3d at 232). When Dr. Wang prescribed medication to address the prisoner's distended abdomen—indicating liver disease and the urgent need for imaging—instead of referring the prisoner to outside care immediately, the court concluded that he must have known that such a "half-measure[]" was inadequate to address the outward symptoms of cancer. *Id.* at 451. And finally, even though Dr. Wang had previously ordered liver imaging (and therefore knew the imaging was necessary), he did not "press to have the previously ordered test performed." *Id.* at 451. Ultimately, the court denied summary judgment to Dr. Wang, as the estate's evidence raised a genuine issue of material fact as to his deliberate indifference. *Id.* at 452.

Finally, when analyzing a medical-needs deliberate-indifference case, courts have considered a plaintiff's allegations both episodically and over time. *See, e.g.*, *Scinto*, 841 F.3d at 228 (analyzing allegations of deliberate indifference that occurred over the course of several months); *Pfaller*, 55 F.4th at 448–52 (analyzing allegations of deliberate indifference both in isolation and over the course of treatment). Here, the court is satisfied that Edwards pleads both concrete examples of treatment shortcomings and general patterns of deficiencies over the course of his medical care. (*See* Am. Compl. ¶¶ 1, 9, 53, 54.).

a. Dr. Wang

Edwards cites multiple examples of deliberate indifference by Dr. Wang between February and May 2023, which plausibly raise an inference that Dr. Wang knew that Edwards's diabetes posed a serious risk of harm, and that Dr. Wang's actions were insufficient to mitigate that risk. *See Parrish*, 372 F.3d at 303.

First, the court can reasonably infer that Dr. Wang knew of Edwards's risk of harm of untreated diabetes—and specifically, the risk of harm from his infected foot ulcers—because he was Edwards's primary treating physician. *See Scinto*, 841 F.3d at 229. Dr. Wang had access to Edwards's medical chart from Nottoway explaining his medical history and, if that were not enough, certainly became more aware of the obvious risk during his treatment, as Edwards's right foot ulcer became bloody and foul. *See Makdessi*, 789 F.3d at 133. Tellingly, Dr. Wang does not dispute that he was aware of Edwards's medical needs, arguing instead that he provided adequate care but that Edwards simply disagrees with this chosen course of treatment. (*See* ECF No. 52, at 4–7.) That argument is unpersuasive.

By citing examples of Dr. Wang's allegedly inadequate and dilatory treatment, Edwards has raised a plausible inference that Dr. Wang actively disregarded the risk of harm presented by the rapidly worsening foot ulcers. Edwards alleges that Dr. Wang failed to follow through on his own recommendations for Edwards's treatment, demonstrating that he "subjectively believed they were necessary, and therefore must have known that failing to provide them would pose an excessive risk." *Lightsey*, 775 F.3d at 179. (*See also* Am. Compl. ¶ 18 ("[Dr. Wang] ordered one gel insole for one of Mr. Edwards's[s] shoes, which was never issued to Mr. Edwards.").) If Edwards's allegations are true, Dr. Wang did not fulfill his "gatekeeper" role and delayed Edward's outside wound-care appointment for more than five weeks—almost half the time between his intake at Green Rock and his amputation. *Dallas*, 2022 WL 4370440, at *8. When Edwards presented with a new ulcer on his right foot after only a week at Green

Rock, Dr. Wang ordered an outside wound-care consult on February 22.[5] (*See* Am. Compl. ¶ 18.) But Edwards did not see Dr. McConahey until March 29, because Dr. Wang (and others) failed to ensure that the appointment had been scheduled. (*See id.* ¶¶ 20–22.) In the meantime, Edwards's condition visibly worsened. (*See, e.g., id.* (alleging that Edwards's foot wounds began oozing and bleeding between February 22 and March 11).) *See Pfaller*, 55 F.4th at 451. While Dr. Wang did provide "some treatment" in-house, like increasing the frequency of Edwards's foot dressings (*see, e.g.*, Am. Compl. ¶ 20), Edwards has plausibly alleged that Dr. Wang knew the care provided at Green Rock was not sufficient to address his rapidly worsening condition and that he failed to secure necessary specialized care. *See De'lonta*, 708 F.3d at 526.

Edwards also alleges that Dr. Wang repeatedly failed to order a wound culture and instead opted for other forms of treatment, such as increasing the frequency of his foot dressings in the later stages of his foot infection. (*See generally* Am. Compl.) To be sure, a prison physician's decision to prescribe one form of treatment over the prisoner's preferred course constitutes only "mere disagreement" that does not rise to the level of deliberate indifference. The court, moreover, should not evaluate a prisoner's deliberate indifference claim related to his medical care (or lack thereof) with the benefit of hindsight. *Sampson*, 536 F. App'x at 357; *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir. 1999), *abrogated on other grounds by Short*, 87 F.4th at 593. But when a prison physician's care diverges egregiously from the accepted professional standard, that can give rise to a deliberate-indifference claim. *See Dallas*, 2022 WL 4370440, at *8. Edwards's allegations about Dr. Wang fall into this category. Throughout his Amended

---

[5] Presumably, Dr. Wang also knew that an outside wound-care consult was advisable from Edwards's Nottoway medical chart. (See Compl. ¶ 9 ("[A Nottoway] doctor started Mr. Edwards on a course of oral antibiotic, Keflex, ordered a wound care consultation, and a consultation by an in-house doctor 'ASAP on Monday.'").)

Complaint, Edwards highlights the medical necessity of conducting wound cultures to discern the strain of bacteria infecting a diabetic ulcer and, relatedly, the efficacy of the antibiotic prescribed. (*See* Am. Compl. ¶ 7.) Dr. Wang prescribed Bactrim antibiotic on two occasions, but it "simply [did] not work[]"; despite Edwards taking his antibiotic as ordered, Edwards's foot grew necrotic. (*Id.* ¶¶ 22–24.) Still, Dr. Wang did not conduct a wound culture until May 3, 2023—only six days before his amputation—which ultimately revealed that Edwards's infection could only be adequately treated with penicillin and ampicillin, not Bactrim alone. (*See id.* ¶ 54.) Edwards has plausibly alleged that Dr. Wang's "woefully deficient" decision to forego a wound culture was knowingly inadequate. (*Id.* ¶ 1.)

Edwards also alleges that Dr. Wang "[e]ither failed to prescribe an appropriate diabetic diet for Mr. Edwards, or Dr. Wang failed to see its implementation," which contributed to "consistently high blood sugar . . . and . . . made him more ulcer prone." (*Id.* ¶¶ 14–16.) While some courts have held that providing diabetes-specific nutritional education without a modified diet does not amount to deliberate indifference, Edwards has alleged that he had no nutrition plan and "no choice" but to eat starchy foods.[6] (*Id.* ¶¶ 14, 15.) *Cf. Scinto*, 841 F.3d at 233 (holding that, because the record indicated that the prisoner was provided nutritional education and he did not deny that he was able to choose a diabetes-friendly meal from the meal options provided, prison staff was not deliberately indifferent for failing to provide him

---

[6] Although Edwards alleges that he had "no choice" but to eat the starchy food options, he alleges the "diabetes food tray available to [him] featured primarily the same starch heavy food as the non-diabetic tray, with a difference only in the substitution of a fruit for the standard dessert option." (Am. Compl. ¶ 14.) This apparent contradiction suggests that Edwards *may have* been provided a specialized nutrition plan implemented by medical staff. But keeping in mind the pleading standard, Edwards has plausibly alleged that Dr. Wang inadequately addressed his nutritional needs. (*See also id.* ¶ 26 (stating that Dr. McConahey "identified Mr. Edwards as a high risk for poor nutrition due to his lack of dietary choices.").)

a nutrition plan). Edwards has stated a claim that Dr. Wang was deliberately indifferent to Edwards's dietary needs, which exacerbated his already serious medical condition.[7]

In sum, Edwards's allegations of Dr. Wang's inadequate and dilatory treatment raise plausible inferences of deliberate indifference. As such, Edwards's claim, as it relates to Dr. Wang, survives his motion to dismiss.

      b.  <u>Director Mayes</u>

On the other hand, Edwards has not adequately pleaded a claim of deliberate indifference against Director Mayes. While it is plausible that she knew about Edwards's diabetes and the attendant risk of harm by treating him and reviewing his medical log at some point "during the relevant period" (Am. Compl. ¶¶ 4, 12), Edwards's allegations, accepted as true, would fail to establish that Director Mayes disregarded that risk in either her personal or supervisory capacities. *See Borrero*, 2023 WL 952365, at *4. Because most of Edwards's allegations towards Director Mayes concern her failure to supervise her staff (*see, e.g.*, Am. Compl. ¶¶ 12, 13, 30), the court first considers the standard for supervisory liability in § 1983 actions.

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. Instead, they "may be liable in their individual capacities only for their personal wrongdoing or supervisory actions that violated constitutional norms." *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special*

---

[7] At the motion-to-dismiss stage, the court will not make factual determinations as to the standard of care of a reasonable physician with regard to prescribing a nutritional plan for a diabetic patient. But it is worth noting that treating physicians and medical staff at the rehabilitation facility placed Edwards on a much stricter, diabetes-specific diet immediately, even while he was in their care for a short period of time. (*See id.* ¶ 55.)

*Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022). To establish a supervisor's liability under § 1983,

a plaintiff must plead

> (1) that the supervisor had actual or constructive knowledge that
> his subordinate was engaged in conduct that posed a pervasive
> and unreasonable risk of constitutional injury to citizens like the
> plaintiff; (2) that the supervisor's response to that knowledge was
> so inadequate as to show deliberate indifference to or tacit
> authorization of the alleged offensive practices; and (3) that there
> was an affirmative causal link between the supervisor's inaction
> and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). These claims generally face a high bar. As to

the first factor, a supervisor's mere knowledge of a supervisee's wrongdoing is not sufficient;

rather, to establish a "pervasive and unreasonable risk of constitutional injury," the plaintiff

must allege that the supervisor knew of "widespread" examples of unconstitutional behavior.

*Shaw*, 13 F.3d at 799. Second, a plaintiff must establish the supervisor's "continued inaction in

the face of documented widespread abuses"; isolated incidents of supervisees' wrongdoing

will not suffice. *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) (holding supervisor liable

under § 1983 because he was aware of and condoned regular tear gassing and hosings of

inmates over more than a year). And under the third factor, the plaintiff must establish

proximate cause between the defendant-supervisor's actions and the plaintiff's eventual harm.

*See id.* at 376.

Edwards does not clear the first hurdle of *Shaw*, because he fails to allege that Director

Mayes knew that the nurses she supervised were engaged in "conduct that posed a pervasive

and unreasonable risk" to Edwards. *Shaw*, 13 F.3d at 799. True, Edwards alleges that Director

Mayes "had access to Mr. Edwards'[s] treatment log, and during the relevant period, [and] . . .

reviewed his treatment log." (Am. Compl. ¶ 12). But this is a general allegation does not give

rise to a plausible inference that Director Mayes checked Edwards's treatment log frequently or thoroughly enough to learn of her staff's alleged noncompliance with Dr. McConahey's care instructions. Indeed, the Complaint states that many nurses failed to document their treatment steps, suggesting that Director Mayes may not have known about their noncompliance with the care instructions. (*Id.* ¶ 30.)[8] And even if the court were to infer that Director Mayes knew of such staff noncompliance, the Amended Complaint alleges only one specific instance where Director Mayes should have ordered the staff to do something differently. (*Id.* (stating that "in April," Director Mayes did not order the nurses to adhere to the treatment protocols).) But this isolated incident would not amount to "tacit authorization of the alleged offensive practices," especially when the nursing staff was otherwise providing care. *Shaw*, 13 F.3d at 799. In the absence of allegations that Director Mayes directly observed Edwards's declining condition at regular intervals, Edwards's contentions that she reviewed treatment logs merely suggests her awareness *that he was receiving treatment*, but not that it was inadequate. Edwards, therefore, cannot establish that Director Mayes is liable under § 1983 for her supervisory actions.

Edwards also alleges that Director Mayes is liable for deliberate indifference because she did not order further testing or secure a wound culture to identify the strain of bacteria in Edwards's infection. (*See, e.g.*, Am. Compl. ¶¶ 13, 32.) But these allegations similarly fall short. Aside from the barebones allegation that Director Mayes treated him during the relevant period, the Amended Complaint does not contain specific examples of her involvement in

---

[8] To the extent that Director Mayes *should* have looked at the logs frequently or *should* have known about her staff's noncompliance, this argument would sound in negligence. *See Lightsey*, 775 F.3d at 178 ("To show an Eighth Amendment violation, it is not enough that an official should have known of a risk[.]").

that treatment beyond initial intake. (*Id.* ¶¶ 12, 19.) This pleading deficiency is notable given

that Edwards was able to identify, on other dates, the specific nurses who treated—or failed

to treat—him. (*See generally id.*) Therefore, by failing to allege that Director Mayes knew that

Edwards was familiar with his worsening condition, Edwards has not adequately alleged that

she was deliberately indifferent to his medical needs.[9]

    c.  <u>Nurse Defendants</u>

       Finally, the court considers Edwards's deliberate indifference claims against each nurse,

collectively referred to in the Complaint as "Defendant Nurses." (*Id.* ¶ 5.) As a threshold

matter, the parties argue over the propriety of group pleading in this case—that is, Edwards's

occasional allegations against "all defendants" or "all nurses."[10] To plead individual § 1983

liability, a plaintiff must allege, specifically, that "each Government-official defendant, through

the official's own individual actions, has violated the Constitution." *King v. Riley*, 76 F.4th 259,

269 (4th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 677). Group pleading is generally too conclusory

to survive a motion to dismiss. *See Borrero*, 2023 WL 9523565, at *4 (dismissing two nurse-

defendants because though "Plaintiff claim[ed] generally that all Defendants were deliberately

indifferent because [they] had knowledge of a substantial risk . . . there [were] no allegations

---

[9] Similar allegations against Director Mayes, such as her failure to schedule an outside care appointment or order supplies for Edwards's treatment (Am. Compl. ¶ 22, 30), fail for the same reason: Edwards has not alleged that she was aware of these treatment needs such that she could disregard them.

[10] Defendants argue that Edwards's "constitutional claims necessarily fail because he does not allege that any specific defendant acted with deliberate indifference." (*See, e.g.*, ECF No. 51, at 4.) Edwards responds that this case lends itself to group pleading, and a collective reference to all Defendants does not change that "Dr. Wang and each nurse know[] exactly what they are charged with." (Pl.'s Mot. Opp. at 16 [ECF No. 57].)

Edwards also alleges gross negligence and medical malpractice against all Defendants, but because the court dismisses those claims in their entirety (for reasons discussed below), it will not address each Defendant's liability separately for those state-law claims.

lodged against [two] Defendants . . . as to the inadequacy of Plaintiff's medical care[.]") Instead, the court must consider the allegations on an individual basis. *King*, 76 F.4th at 269. To the extent that an allegation is directed towards a group of Defendants (i.e., "all nurses"), the court should consider whether the statement specifically identifies the Defendant's individual action that deprived Edwards of his Eighth Amendment rights, so as to meet the pleading standard for each individual Defendant.

Like his claims against Dr. Wang and Director Mayes, Edwards has sufficiently alleged that each Defendant Nurse knew about his diabetes and the risk of harm of the untreated disease. *See Farmer*, 511 U.S. at 837. At some point during the relevant period, each Defendant Nurse treated him—albeit to varying degrees—by conducting his intake exam, dressing his ulcerated feet, and conducting assessments of his worsening condition. Additionally, certain nurses, like Nurse Miraglia, treated Edwards often and "personally witnessed the degeneration" of Edwards's condition over time. *Formica*, 739 F. App'x at 758. (*See, e.g.*, Am. Compl. ¶¶ 13, 20, 22, 30.) But the court must still determine if Edwards has sufficiently alleged that *each* Defendant Nurse disregarded that risk.

First, Edwards states a plausible claim against Defendant Nurses Autry, Miraglia, Suitt, Toler, and Weaver for their failure to follow Dr. McConahey's March 29 wound-cleaning instructions.[11] (*Id.* ¶ 30.) While the Amended Complaint alleges that these Defendant Nurses were aware of Dr. McConahey's orders—Edwards alleges that the instructions were not placed

---

[11] Edwards also alleges that Nurses Toler and Weaver were deliberately indifferent to his medical needs by prescribing Bengay for his aching leg and Lubriderm for new areas of flaky skin, respectively. (Am. Compl. ¶ 37.) Without additional allegations establishing that these Nurses knew that these symptoms were signs of diabetic complications and knew that their over-the-counter solutions were insufficient to mitigate the risk of these complications, these allegations do not, standing alone, establish claim of deliberate indifference.

in Edwards's electronic medical chart. (*Id.* ¶ 29.) Instead, they were hand-written and placed

in his Health Services Complaint Form. (*Id.*) Edwards ultimately alleges that the Defendants

used a certain type of wound dressing prescribed by Dr. McConahey (the Hydrofera dressing)

but not the others (the ABD pads and Optifoam dressing). (*Id.*) The court can reasonably infer

that these Defendant Nurses were aware of Edwards's special care instructions, as well as the

wounds and edemas on his feet, but disregarded the need to provide appropriate care. (*See id.*

(alleging that the Nurses did not order the Optifoam dressing or ABD pads, which were out

of stock "more than 3 weeks after Dr. McConahey first issued the wound dressing

protocols").)

Edwards also alleges that Nurse Miraglia engaged in additional conduct that, if true,

would constitute deliberate indifference. According to the Amended Complaint, on May 5 and

6, 2023, Nurse Miraglia failed to follow Dr. McConahey's revised wound-cleaning orders,

despite Edwards's foot discoloration, odor, and "obvious signs of infection." (*Id.* ¶¶ 49–50.)

On May 7, she cleaned Edwards's foot with the appropriate AquacelAg dressing. (*Id.* ¶ 50.)

Her eventual compliance with the orders suggests that Nurse Miraglia knew about them in the

days prior, and, by not following them until May 7, she must have known that the "half-

measures" were insufficient to mitigate Edwards's risk of harm. *Pfaller*, 55 F.4th at 451. This

example of Nurse Miraglia's alleged failure to treat is especially "conscience-shocking," given

that she treated Edwards most frequently and, in so doing, was familiar with his non-response

to the medications prescribed and his deteriorating condition. *Parrish*, 372 F.3d at 303. And

despite Edwards's inquiries about when the outside foot-care appointment was to occur,

Nurse Miraglia failed to confirm that his wound-care appointment had been made. (Am.

Compl. ¶ 22.) Like Dr. Wang, she did not fulfill her "gatekeeper" function to ensure Edwards's access to capable medical care. *Dallas*, 2022 WL 4370440, at *8; *see also Pfaller*, 55 F.4th at 450 (holding that physician's failure to refer patient to medical provider capable of treating the condition could constitute deliberate indifference).

On the other hand, Edwards has not plausibly stated a claim of deliberate indifference against the remaining Nurse Defendants Crockett, French-Torres, Haymore, Hodnett, Keene, Suitt, Tuck, and Williams. Aside from being categorically included in allegations against "all defendants" or "all nurses," the Amended Complaint lacks specific factual allegations about their alleged failings. For example, Edwards alleges that, despite receiving treatment from Nurses Hodnett and Haymore in his first three weeks at Green Rock, he "still developed a wound." (Am. Compl. ¶ 18.) Similarly, the crux of Edwards's allegations against Nurses French-Torres, Keene, and Williams are that, even though he presented to them for treatment at some point in his first weeks at Green Rock, a wound-care appointment "had not been scheduled." (*Id.* ¶ 20.) Both statements—essentially the only substantive allegations against these individuals—fail to plausibly establish that these Defendant Nurses knew that their actions were insufficient to address Edwards's potential diabetic injuries.

Finally, Edwards alleges that Nurses Tuck and Crockett[12] did not follow Dr. McConahey's wound-care instructions (ordered May 4) on May 5 and 6. (Am. Compl. ¶¶ 47, 49.) Edwards states a claim against Nurse Miraglia for this failure to treat—because, as

---

[12] Edwards also alleges that a wound-care appointment "had not been scheduled, despite . . . having been seen by Nurses Crockett, French-Torres, Keene, Miraglia, and Williams[.]" (Compl. ¶ 20.) This allegation does not state a claim of deliberate indifference against Nurse Crockett for the same reasons it does not state a claim against Nurses French-Torres, Keene, and Williams, as described above.

described above, her compliance with the orders on May 7 suggests she knew about them but did not follow them in the days prior. But he fails to plausibly allege that Nurses Tuck and Crockett eventually followed Dr. McConahey's updated orders, so the court can't infer that they knew about them. Undoubtedly, Edwards's wounds put these Nurses on notice of his rapid deterioration, but Edwards nevertheless fails to allege that these Nurses knew of and actively disregarded Dr. McConahey's orders. Therefore, the court concludes that Edwards has failed to state a claim of deliberate indifference against Defendant Nurses Crockett and Tuck, as well as Nurses French-Torres, Haymore, Hodnett, Keene, and Williams.

B.  <u>Medical Malpractice Based on Gross Negligence</u>

In Count II of the Amended Complaint, Edwards brings state-law claims of gross negligence and medical malpractice against all Defendants. As a threshold matter, it is unclear whether Edwards alleges medical malpractice on the basis of gross negligence or if he alleges gross negligence and medical malpractice as distinct claims. The parties argue past each other in their briefs. Defendants argue that medical-malpractice claims are shielded by sovereign immunity, and in reply, Edwards only argues that sovereign immunity does not bar claims of gross negligence (without mentioning "medical malpractice" at all). (*See* Pl.'s Opp. at 25–26 [ECF No. 57].) Because sovereign immunity does not bar claims of gross negligence in Virginia—but often does for medical-malpractice claims—the court finds it necessary to address two scenarios. *See Nat'l R.R. Passenger Corp. v. Catlett Volunteer Fire Co., Inc.*, 948 F.2d 1282 (4th Cir. 1991) (unpublished) ("In Virginia, an individual cloaked with sovereign immunity is liable only for gross negligence." (citing *James v. Jane*, 282 S.E.2d 864, 868 (Va. 1980))); *see also Patterson v. City of Danville*, 875 S.E.2d 65, 73 (Va. 2022) (analyzing gross

negligence and ordinary negligence medical-malpractice claims separately because "[a]llegations of gross negligence can pierce through a derivative-sovereign-immunity defense asserted by an otherwise immune government employee."). Therefore, the court first considers Edwards's allegations as if he premised his medical-malpractice claims on the Defendants' alleged gross negligence. *See Hutcheson*, 2018 WL 814059, at *5 (addressing ordinary medical-malpractice claims separately from those "sounding" in gross negligence). Then, the court considers the allegations as if he intended to claim ordinary medical malpractice and gross negligence as two distinct claims.

Turning first to the scenario in which Edwards bases his medical-malpractice claim on gross negligence: Edwards alleges that, by falling below the standard of care of reasonably prudent health-care practitioners, all Defendants were grossly negligent in their treatment of his diabetes. (Am. Compl. ¶ 59.) In response, Defendants argue that they are absolved of liability for gross negligence because, over the course of their treatment of Edwards, they all provided some degree of care. (*See* ECF No. 52, at 9; ECF No. 56, at 9; ECF No. 62 ¶ 23.) The court agrees with Defendants.

When analyzing state-law claims, federal courts must look to the relevant law of the state in which the alleged harm occurred—in this case, Virginia. *See Real Time Med. Sys., Inc. v. PointClickCare Tech. Inc.*, 131 F.4th 205, 224 (4th Cir. 2025). In the Commonwealth, "[g]ross negligence is 'a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person.'" *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (quoting *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004)). Gross negligence "requires a degree of negligence that would shock fair-

minded persons." *Cowan*, 603 S.E.2d. at 918. The Supreme Court of Virginia has recognized that, while isolated incidents of negligence "separately may not amount to gross negligence," the combination of individual incidents "may have a cumulative effect showing a form of reckless or total disregard for another's safety," particularly when the pattern involves "deliberate conduct." *Chapman v. City of Virginia Beach*, 475 S.E.2d 798, 801 (Va. 1996) (cleaned up).

Claims of gross negligence are often alleged alongside claims of deliberate indifference, and "[d]istrict courts in the Fourth Circuit have repeatedly held that, where plaintiffs state a claim for deliberate indifference under § 1983, they likewise state a claim for gross negligence under Virginia law." *Sosa v. Hill*, No. 1:24cv499, 2025 WL 864291, at *11 (E.D. Va. Mar. 19, 2025) (listing cases in which allegations of defendant's *complete* lack of care, like failing to provide medical care or protection from other inmates, stated both deliberate-indifference and gross-negligence claims). But this is not always the case. Because Virginia has a "uniquely high standard for gross[-]negligence claims," there are cases where "a deliberate[-]indifference claim . . . succeed[s] where a gross[-]negligence claim cannot." *Cantrell v. McCoy*, 553 F.Supp.3d 295, 306 (W.D. Va. 2021). Deliberate-indifference claims are predicated on allegations of inadequate care and unreasonable responses to a known risk, *Moran*, 1 F.4th at 302, whereas claims of gross negligence are sustained on allegations of indifference and neglect. *See Cowan*, 608 S.E.2d at 918; *Patterson*, 875 S.E.2d at 75 (rejecting previous gross-negligence claim against the defendant because his "multiple efforts to treat [the prisoner]—whether or not negligently performed—demonstrate that [the defendant] was exercising 'some degree of care' in his capacity as a physician[.]") Accordingly, even in instances where a plaintiff adequately states a

claim of deliberate indifference, "a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Elliott*, 791 S.E.2d at 732; *see also Cantrell*, 553 F.Supp.3d at 306 (granting summary judgment to plaintiff on deliberate-indifference claim because the record showed that the defendant did not respond reasonably to the risk, but denying summary judgment on gross-negligence claim because "[n]o reasonable person could conclude that [defendant] exercised *no* care with respect to [plaintiff]"). Because of the variation in factual allegations and procedural posture, analyzing a claim of gross negligence is an especially fact-based inquiry. *See Rucker v. Piedmont Reg'l Jail Auth.*, No. 3:21cv412, 2021 WL 3863346, at *7 (E.D. Va. Aug. 30, 2021) (quoting *Wallower v. Martin*, 144 S.E.2d 289, 292 (Va. 1965)).

Here, Edwards has alleged that all Defendants, at some time and in some manner, provided him with medical treatment. (*See, e.g.*, Am. Compl. ¶¶ 13, 18, 19, 20, 21, 31, 37.) While questions remain about the adequacy of this treatment and other omissions, those issues pertain to Edwards's deliberate-indifference claim. *See Moran*, 1 F.4th at 302. Insofar as he pleads medical malpractice on the basis of gross negligence against all Defendants, Edwards has alleged that each "exercised some degree of care," and his claims must fail as a matter of law against all Defendants. *Elliott*, 791 S.E.2d at 732.

## C. Ordinary Medical Malpractice

On the other hand, Edwards has stated a claim of ordinary medical malpractice—*i.e.*, a claim sounding in ordinary negligence—against Defendants Autry, Mayes, Miraglia, Suitt, Toler, Wang, and Weaver.

"The Virginia Medical Malpractice Act ('the VMMA') defines medical malpractice as 'any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient.'"[13] *Washington v. Brooks*, No. 3:20cv88-HEH, 2021 WL 4975268, at *3 (E.D. Va. Oct. 26, 2021) (citing Va. Code Ann. § 8.01-581.1). To state an ordinary medical-malpractice claim in Virginia, "a plaintiff must establish (1) the applicable standard of care, (2) a deviation from that standard, and (3) that such deviation proximately caused the plaintiff's injuries." *Byers v. City of Richmond*, 746 F.Supp.3d 275, 334 (E.D. Va. 2024).[14]

With respect to the first element, the standard of care by which all health care defendants are judged in Virginia is "that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth." Va. Code. Ann. § 8.01-581.20(A). To establish that the defendant deviated from this "reasonably prudent" standard, a plaintiff must allege specific factual examples of the defendant's breach,

---

[13] The court notes that

> [t]he VMMA provides a set of rules that govern malpractice claims; it does not determine "when the patient has a cause of action—*an entirely separate issue*" . . . . Thus, the application of the VMMA necessarily presumes an underlying cause of action before the [c]ourt can consider whether or not the [VMMA] applies.

*Caruth v. Clark*, No. 1:16-cv-149, 2017 WL 1363314, at *7 (E.D. Va. Apr. 12, 2017) (quoting *Simpson v. Roberts*, 752 S.E.2d 801, 806 (Va. 2014) (McClanahan, J., concurring)). Because the court ultimately concludes that Edwards has stated a plausible cause of action for medical malpractice against select Defendants, the rules of the VMMA—including restrictions and caps on certain types of recovery, as well as requirements for pre-filing expert certification—will govern Edwards's claim in further stages of this litigation. *See, e.g.*, Va. Code Ann. § 8.01-581.15.

[14] Expert testimony is "ordinarily necessary" to prove a medical-malpractice claim, particularly with respect to the standard of care, unless the evidence of negligence is within the ordinary experience and knowledge of a lay juror. *Beverly Enters.-Va. v. Nichols*, 441 S.E.2d 1, 3 (Va. 1994). Therefore, Edwards will need to prove the veracity of his allegations on summary judgment or at trial, but at the motion to dismiss stage, the court reviews his allegations for plausibility.

such as failure to administer treatment in a timely fashion, to provide a patient with proper nutrition, to treat an injury properly, or to supervise subordinate medical staff properly. *See Washington*, 2021 WL 4975268, at *3; *Thomas v. United States*, No. 2:18-00671-RMG, 2019 WL 643484, at *2 (D.S.C. Feb. 15, 2019); *Perdieu v. Blackstone Fam. Prac. Ctr., Inc.*, 568 S.E.2d 703, 710–11 (Va. 2002). Finally, "[t]o establish causation, a plaintiff must show 'it is more likely than not that the [plaintiff] would have [gone uninjured] in the absence of defendant's negligence.'" *See Wertman v. United States*, No. 7:15-cv-00466, 2017 WL 363019, at *11 (WD. Va. Jan. 24, 2017) (citing *Murray v. United States*, 215 F.3d 460, 463 (4th Cir. 2000)).

Here, Edwards has satisfied the first element by alleging the applicable standard of care. He alleges that, to adequately treat diabetes, a reasonably prudent practitioner should test for vascular competence, prescribe a diabetes treatment plan, manage medication for incarcerated patients, promptly perform wound cultures to identify the strain of infectious bacteria, and abide by wound cleaning and dressing instructions (among other steps). (*See* Am. Compl. ¶¶ 7–8; *see also id.* ¶ 4 (alleging also that standard of care, specific to Director Mayes, was adequately directing the nursing staff to ensure quality patient care in her supervisory role).) Therefore, by asserting that Defendants were responsible, in some way or another, for overseeing and providing Edwards with adequate medical care on par with a reasonably prudent medical practitioner, he has alleged the first element of his claim. (*See id.* ¶¶ 3–5.)

Edwards has also adequately alleged that some Defendants—though not all—deviated from the "reasonably prudent" standard. Foremost, the Amended Complaint is rife with specific allegations against Dr. Wang, such as his failure to conduct cultures on Edwards's foot wounds promptly, his delay in scheduling Edwards's outside-care appointments, and his

failure to provide Edwards with appropriate meal planning or medication management. (*See, e.g., id.* ¶¶ 15, 22.) *See also Washington*, 2021 WL 4975268, at *3. Director Mayes—who, as noted, was responsible for supervising the nursing staff and ensuring quality patient care (*id.* ¶ 4)—allegedly failed to correct her staff's conduct when they did not adhere to treatment protocols or document their treatment steps, despite that action being a central part of her role. (*See id.* ¶¶ 12, 30.)

On the other hand, Edwards cannot establish a uniform breach of care amongst all the Defendant Nurses. He does so for some Nurses—Defendants Autry, Crockett, Miraglia, Suitt, Toler, Tuck, and Weaver—who did not follow Dr. McConahey's treatment notes when caring for Edwards in the more severe stages of his infection. (*See id.* ¶¶ 30, 49; ¶ 22 (alleging Defendant Miraglia failed to schedule his outside-care appointment); ¶ 37 (alleging that Defendants Weaver and Autry prescribed him over-the-counter solutions to treat his diabetic symptoms).) *See Thomas*, 2019 WL 643484, at *2 (identifying improper treatment of injury as an example of a breach in medical-malpractice suits). For Defendants French-Torres, Haymore, Hodnett, Keene, and Williams, however, Edwards fails to specifically—or plausibly—allege that they deviated from the standard of care. In fact, as noted above, the only allegations that concern these Defendants merely establish that they provided care. (*See* Am. Compl. ¶¶ 18, 20.) Without more, the allegations that Edwards's injuries developed at some point after these Nurses provided treatment—when at least nine other practitioners were also treating him during that time—do not plausibly establish *these* Defendants' deviation from the standard of care. (*Id.*) Therefore, the court proceeds to the third element—proximate

cause—but omits Defendants French-Torres, Haymore, Hodnett, Keene, and Williams from the analysis.

Edwards has adequately alleged that the remaining Defendants' actions, in some fashion, "materially contributed to his suffering and loss of his foot." (*See, e.g.*, *id.* ¶¶ 17, 37, 42, 49, 59 (stating that Defendants failed to treat him in accordance with allegedly appropriate diabetes management, which worsened his infection, contributed to foot ulcers and necrotic skin, and resulted in his amputation).) *See Wertman*, 2017 WL 363019, at *11 (inferring that, but for the improper techniques employed during surgery by multiple surgeons, the deceased patient would have survived). From start to finish, Edwards threads a narrative through the Amended Complaint establishing that, without the alleged deficiencies in his diabetes care, it is "more likely than not" that he would not have needed an amputation. *Wertman*, 2017 WL 363019, at *11. (*See* Am. Compl. ¶ 6.) Edwards, therefore, has stated a claim of ordinary medical malpractice against Defendants Autry, Crockett, Mayes, Miraglia, Suitt, Toler, Tuck, Wang, and Weaver.

In an attempt to avoid this conclusion, Defendants argue that, as employees of the Commonwealth, sovereign immunity bars Edwards's medical-malpractice claim. (*See, e.g.*, Def.s' Br. Supp. Mot. Dismiss at 7–9 [ECF No. 52].) *See Coppage v. Mann*, 906 F. Supp. 1025, 1047 (E.D. Va. 1995) ("The doctrine of sovereign immunity protects the Commonwealth from claims of ordinary negligence asserted against it."); *Pfaller*, 55 F.4th at 464 (Wilkinson, J., concurring) (observing that, under certain conditions, "[t]he Virginia Supreme Court has thus determined that medical-malpractice suits alleging a [state-employed] doctor's negligence . . . are therefore barred by sovereign immunity."). As with claims of gross negligence, courts look

to state common law to determine the applicability of sovereign immunity. *See Patterson*, 875 S.E.2d at 69 ("Claims against localities and their employees . . . continue to be governed by common-law principles."). In Virginia, the court employs a four-factor balancing test ("the *James* test") to determine whether the medical professional is entitled to the state's sovereign immunity:

> (1) "the function th[e] employee was performing"; (2) "the extent of the state's interest and involvement in that function"; (3) "[w]hether the act performed involves the use of judgment and discretion"; and (4) "the degree of control and direction exercised by the state over the employee."

*Pfaller*, 55 F.4th 436, 456 (4th. Cir. 2022) (quoting *James v. Jane*, 282 S.E.2d 864, 869 (Va. 1980)).

The pleadings here, however, do not provide "a solid evidentiary basis" to perform a thorough *James* analysis. Turning first to the Amended Complaint, the court can only glean that the Defendants are "employees of" or "employed by" VDOC (Am. Compl. ¶¶ 2, 5), but merely serving as an employee of the Commonwealth does not automatically entitle one to the protection of sovereign immunity.[15] *See Patterson*, 875 S.E.2d at 70 (establishing that state employees may be immune from medical-malpractice claims if they satisfy the *James* test). In response, rather than asserting facts that the court could apply to each factor of the *James* analysis, Defendants argue that previous courts have found state-employed practitioners— including Dr. Wang—are entitled to sovereign immunity. *See, e.g.*, *Patterson*, 875 S.E.2d at 75; *Pfaller*, 55 F.4th at 458. Crucially, however, those cases were decided on summary judgment,

---

[15] Further, Edwards's reply brief raises concern that some Defendants are contractors, rather than employed directly by the Commonwealth. (Pl.'s Mot. Opp. at 25 n.4 [ECF No. 57].) The distinction is significant because, in Virginia, independent contractors are not entitled to the defense of sovereign immunity. *See Atkinson v. Sachno*, 541 S.E.2d 902, 904–05 (Va. 2001) (establishing that "all independent contractors are excluded from [the] protection [of the sovereign-immunity defense]"). To properly resolve this case on the merits, the parties should be afforded an opportunity to conduct discovery on this issue.

with a full *James* analysis, under different factual circumstances. *Id.*; *see also Hutcheson*, 2018 WL
814059, at \*6 (determining that medical doctor was entitled to sovereign immunity at motion
to dismiss stage because the complaint included, among other relevant allegations, that
defendant was subject to the policies, oversight, and control of the county). Despite *Patterson*
and *Pfaller*'s similarities to this case, the court must work from the allegations before it and will
consider the Defendants' sovereign-immunity defenses only with sufficient evidence of their
roles and responsibilities in VDOC.

## IV. CONCLUSION

For the reasons discussed above, the court will grant the motions to dismiss in part.
Specifically, with respect to Count I, court will grant the motions of Defendants Crockett,
French-Torres, Haymore, Hodnett, Keene, Mayes, Tuck, and Williams, but it will deny the
motions of Defendants Autry, Miraglia, Suitt, Toler, Wang, and Weaver. With respect to Count
II, the court will grant the motions of Defendants French-Torres, Haymore, Hodnett, Keene,
and Williams, but it will deny the motions of Defendants Autry, Crockett, Mayes, Miraglia,
Suitt, Toler, Tuck, Wang, and Weaver. Defendants French-Torres, Haymore, Hodnett, Keene,
and Williams will be dismissed from this action.

The Clerk is directed to forward a copy of this Order to the parties.

**ENTERED** this 12th day of January, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE